**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| LIMELIGHT TRADING CARDS, LLC | § | |
| *Plaintiff,* | § | |
| v. | § | No. _______________ |
| DAVID FYE, LOGAN COX, AND BLACK LABEL BREAKS LLC | § | |
| *Defendants.* | § | |

**ORIGINAL COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF**

Plaintiff Limelight Trading Cards, LLC ("Limelight") files this *Original Complaint and Application for Injunctive Relief* against Defendants David Fye ("Fye"), Logan Cox ("Cox"), and Black Label Breaks LLC ("Black Label Breaks") (all defendants, together, the "Defendants" and "Co-Conspirators") and shows the Court as follows:

## I. INTRODUCTION

1. Limelight is a direct-to-consumer trading card and sports memorabilia store, specializing in autographed sports trading cards. Fye Sports Cards, LLC ("Fye Sports Cards") formerly was a sports cards and rare sports collectibles retailer with a brick-and-mortar store front in Colleyville, Texas. Limelight purchased substantially all of Fye Sports Cards' assets out of bankruptcy.[1]

2. Following the Bankruptcy Court's *Order Confirming Debtor's Amended Plan of Reorganization* (the "Confirmation Order"), Fye—Fye Sports Cards' former principal—conspired

[1] *In re FYE Sports Cards LLC*, Cause No. 24-31613 (Bankr. S.D. Tex. 2024).

with Black Label Breaks and Cox to injure Limelight's business and reputation. Defendants did so through interfering with the Confirmation Order, breaching fiduciary duties, tortious interference with existing and prospective business relations, false designation of origin and unfair competition under the Lanham Act, common law misappropriation and unfair competition, theft, and trade secret misappropriation under the Texas Uniform Trade Secrets Act and the Defend Trade Secrets Act.

3. As part of the Confirmation Order, and the Amended Plan of Reorganization and Asset Purchase Agreement incorporated therein (each, as defined therein), Limelight purchased "all of the tangible and intangible assets and property of [Fye Sports Cards], wherever located including but not limited to intellectual property, whether or not specifically scheduled."[2]

4. This sale included all of Fye Sports Cards' intellectual property, including a Facebook group called "Black Label Breaks" (the "BLB Group"). Fye Sports Cards originally created this private Facebook group to connect with customers, effectuate sales, and to create and maintain an online presence. The creation of BLB Group was undoubtedly a success for Fye Sports Cards as sales from the BLB Group comprised a large portion of Fye Sports Cards' revenue, and almost 65% of Limelight's sales after the BLB Group was transferred post-purchase. As of March 2025, the BLB Group has more than 6,000 members.

5. After the Bankruptcy Court entered its Confirmation Order, Fye effectuated the transfer of all of Fye Sports Cards' assets—including control over this Facebook group—to Limelight. Indeed, Limelight even announced its new ownership on the BLB Group and maintained administrative control and access. This control allowed Limelight (and its chosen

[2] *In re FYE Sports Cards LLC*, Cause No. 24-31613, Dkt. No. 73 pg. 79 (Bankr. S.D. Tex. 2024).

delegates) to admit new users to the BLB Group and otherwise moderate the private community that Limelight had purchased.

6. After the closing of the sale transaction between Fye Sports Cards and Limelight, Fye became an employee of Limelight. Fye was a purchasing manager and primarily responsible for purchasing inventory for sale, generally managing the BLB Group (both actually and through administrator privileges), tending to the brick-and-mortar store, as well as other tasks.

7. However, on or about February 13, 2025, Fye resigned from his employment at Limelight and ***one day*** later formed a competing business, Black Label Breaks—the same name as the BLB Group that Limelight had purchased.[3] Fye then began to post on the BLB Group his own business transaction offers. What's more, on or about February 18, 2025, Fye locked Limelight out of the BLB Group, preventing Limelight from having access to (let alone using) the BLB Group to conduct business. Fye usurped control of the BLB Group and removed all Limelight personnel from the Facebook group. In essence, Fye absconded with the BLB Group.

8. Fye has also refused to turn over control of the Limelight WhatNot[4] account, where Limelight conducted online sales, back to Limelight. This has led to Limelight losing another source of potential income due to Fye's improper actions.

9. On information and belief, Fye did so at the behest of—and with the aid of— Logan Cox, a longtime customer of Fye and Fye Sports Cards.

10. Defendants' actions have resulted in Defendants absconding with one of the most valuable assets purchased by Limelight. Moreover, Fye's masquerading as Black Label Breaks has confused the public at large into believing Fye is the true owner of the BLB Group, despite the

[3] *See infra* Section IV.C.32.

[4] Whatnot is a live-stream shopping platform where users can buy and sell in online video auctions. https://en.wikipedia.org/wiki/Whatnot

group having been sold to Limelight. Finally, Fye's improper exclusion of Limelight from the BLB Group had injured Limelight through continued loss of sales, reputational damage, and loss of goodwill.

11. As such, suit is necessary both to make Limelight whole following the Defendants' wrongful actions and to enforce the terms of the Confirmation Order.

## II.
## PARTIES

12. Plaintiff Limelight Trading Cards, LLC is a Texas limited liability company with its principal place of business in Colleyville, Texas, who has appeared through counsel.

13. Defendant David Fye is an individual residing in Tarrant County, Texas, and may be served with process at 2321 Brookcrest Lane, Grapevine TX 76051, or wherever he may be found. Summons is requested so he may be cited to appear.

14. Defendant Logan Cox is an individual residing in Tarrant County, Texas, and may be served with process at 4004 Tara Dr., Colleyville TX 76034, or wherever he may be found. Summons is requested so he may be cited to appear.

15. Defendant Black Label Breaks LLC is a domestic limited liability company with its principal place of business in Tarrant County, Texas, and may be served with process through its registered agent for service of process, United States Corporation Agents, Inc., at 10601 Clarence Dr., Suite 250, Frisco TX 75033, or its Managing Member, David Fye, at 2321 Brookcrest Lane, Grapevine TX 76051, or wherever he may be found. Summons is requested so it may be cited to appear.

## III.
## VENUE AND JURISDICTION

16. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper pursuant to 28 U.S.C. § 1409.

## IV.
## FACTUAL BACKGROUND

17. Fye Sports Cards was formed by David Fye on January 19, 2021, as a "sports cards and rare sports collectibles retailer with a brick-and-mortar store front" in Colleyville, Texas.[5] Importantly, "[i]n addition to instore sales, [Fye Sports Cards] sells its merchandise through online sales platforms[.]"[6]

18. Fye Sports Cards filed its voluntary petition proceeding under Subchapter V of Chapter 11 of the Bankruptcy Code on April 10, 2024.[7] Fye Sports Cards listed $56,669.08 of assets, with $32,423.00 in "Merchandise," consisting largely of valuable trading cards and sports memorabilia.[8] Fye Sports Cards listed more than $1,750,000 in liabilities.[9]

19. Throughout Fye Sports Cards' business operations, Fye Sports Cards operated a "Fye Sports Cards" Facebook page and a "Black Label Breaks" private and closed Facebook group. The BLB Group consists of more than 6,000 members and requires permission from one of the group's administrators to either join or have visibility into the BLB Group.

20. Limelight is also in the trading card and memorabilia space. Limelight advertises that "[t]he best part of the hobby is the community, and that's exactly what we hope to bring together!"

21. Limelight was formed, in part, due to its founder-president meeting and befriending Fye. Limelight's founder-president met Fye prior to Fye Sports Cards filing for bankruptcy and was aware of Fye Sports Card's plans to seek bankruptcy protection. Limelight's founder-president

[5] *In re FYE Sports Cards LLC*, Cause No. 24-31613, Dkt. No. 73 pg. 71 (Bankr. S.D. Tex. 2024).

[6] *In re FYE Sports Cards LLC*, Cause No. 24-31613, Dkt. No. 73 pg. 7 (Bankr. S.D. Tex. 2024).

[7] *In re FYE Sports Cards LLC*, Cause No. 24-31613, Dkt. No. 73 pg. 7 (Bankr. S.D. Tex. 2024).

[8] *In re FYE Sports Cards LLC*, Cause No. 24-31613, Dkt. No. 73 pgs. 7 & 30–31 (Bankr. S.D. Tex. 2024).

[9] *In re FYE Sports Cards LLC*, Cause No. 24-31613, Dkt. No. 73 pgs. 8–9 (Bankr. S.D. Tex. 2024).

even began supporting Fye's business and eventually had approximately $200,000 of personal inventory on consignment with Fye Sports Cards.

22. At one point, consignment reached close to 90% of Fye Sports Cards' inventory, with Fye himself stopping any further inventory purchases, presumably due to a lack of liquidity (based upon the impending bankruptcy). Ultimately, Fye Sports Cards filed for bankruptcy protection.

**A. The Asset Purchase Agreement**

23. Limelight expressed an interest in purchasing all of Fye Sports Cards' assets through the bankruptcy process. After negotiations, Limelight and Fye Sport Cards executed an Asset Purchase Agreement, which was incorporated into the Bankruptcy Court's Confirmation Order.

24. The Asset Purchase Agreement is relatively straightforward. As summarized in the recitals thereto, "[Fye Sports Cards] desires to sell to [Limelight] all of the Assets, and [Limelight] desires to purchase from [Fye Sports Cards] all of the Assets[.]"[10] Pursuant to the Asset Purchase Agreement, Fye Sports Cards was obligated to "sell, transfer, assign, convey, and deliver . . . all right, title, and interest of [Fye Sports Cards], in, to, or under, of certain tangible property, including but not limited to those assets described in more detail in Schedule I."[11] "The Assets" is further defined as "all of the tangible and intangible assets and property of [Fye Sports Cards], wherever located including but not limited to intellectual property, whether or not specifically scheduled."[12]

---

[10] *In re FYE Sports Cards LLC*, Cause No. 24-31613, Dkt. No. 73 pg. 37 (Bankr. S.D. Tex. 2024).

[11] *In re FYE Sports Cards LLC*, Cause No. 24-31613, Dkt. No. 73 pg. 39 (Bankr. S.D. Tex. 2024).

[12] *In re FYE Sports Cards LLC*, Cause No. 24-31613, Dkt. No. 73 pg. 41 (Bankr. S.D. Tex. 2024).

**B. Post-Confirmation Conduct**

25. The Confirmation Order was entered on September 27, 2024. Thereafter, Fye Sports Cards and Fye effectuated the terms of the Asset Purchase Agreement and transferred all of Fye Sports Cards' assets to Limelight. This included the transfer of Fye Sports Cards' online groups and pages, and specifically the Fye Sports Cards Facebook page, WhatNot account, and the Black Label Breaks Facebook group. The Fye Sports Cards Facebook page became the Limelight Facebook page and the BLB Group transferred administration to Limelight personnel.

26. As part of the transition of assets and online persona from Fye Sports Cards to Limelight, Fye agreed to continue as a Limelight employee. Fye played an important role at Limelight, interfacing with existing clients, shepherding the brick-and-mortar store, and ensuring a continuation of services during the transition. Indeed, Fye even personally posted a Facebook video announcing the "huge news" that Fye Sports Cards would be transitioning to Limelight. Fye became Limelight's purchasing manager, and through the continuity of Fye's services, Fye became associated with Limelight to the customers, employees, and community at large.

**C. Defendants' Tortious and Contemptuous Conduct**

27. While Fye worked at Limelight after the transition, Fye's employment was not without issues.

28. On February 13, 2025, Limelight management asked Fye to attend a meeting regarding his performance. Immediately prior to this meeting, Fye made certain statements which indicated he had already determined he would be resigning from Limelight. After Limelight's management started the meeting and began discussing Fye's performance failures (such as not following protocol and making unauthorized purchases), Fye resigned without completing the meeting. February 13, 2025, was Fye's last day at Limelight, and the first day Fye's plotting came to light.

29. On February 14, 2025, Fye—still an administrator of the BLB Group—removed the administrator rights for all Limelight employees. That same day, Fye began posting his own business transactions on the BLB Group, soliciting sales and purchases of trading cards in his own possession. Up to this point, Fye Sports Cards (prior to the Asset Purchase) and Limelight (subsequent to the Asset Purchase) were the only ones posting business transactions on the BLB Group. No third-party sellers were permitted to post business transactions in the BLB Group. After resigning, Fye began individually posting on the BLB Group and actively competing against Limelight within the group. Fye went as far as to delete posts from Limelight, the true owner of the page. Upon information and belief, Fye has been consistently posting business transactions in the BLB Group since his takeover.

30. Fye's actions became more hostile towards Limelight in the following days. On February 18, 2025, Fye completely removed Limelight's access to the BLB Group. As a removed group member, Limelight could no longer make any business posts, view interactions within the BLB Group, or even see the list of members within the group.

31. As a direct result of Limelight's exclusion from the BLB Group, Limelight has suffered damages; Limelight's sales have declined by ***close to 60%*** since its ouster.

32. Moreover, Fye went on to file a Certificate of Formation, legally forming Black Label Breaks, LLC, a Texas limited liability company, ***one day*** after he resigned from Limelight, and has, on information and belief, used this business entity to transact Fye's business on the BLB Group. Fye's formation of Black Label Breaks and use of the BLB Group to market his business transactions has led to confusion within the marketplace, especially with Limelight's consumers. For example, and on various occasions, Limelight has received inadvertent payments from

customers for purchases of product from Fye, resulting in customers requesting refunds after identifying that Limelight was no longer in charge of the BLB Group.

33. Most recently, Fye has received "redemption cards"[13] that belong to Limelight, which are a valuable source in the trading card and memorabilia world. Fye received these cards by changing the shipping address for the respective account and did so, on information and belief, so that these redemption cards would be received by Fye rather than Limelight.

34. Finally, Fye has also gone to defame Limelight by spreading mal and misrepresentations regarding Limelight and the circumstances surrounding Limelight's acquisition of Fye Sports Cards and Fye's eventual departure. In fact, various customers have indicated they would never do business with Limelight again as a result of Fye's false representations.

## V.
## CAUSES OF ACTION

### A. COUNT ONE – False Designation of Origin and Unfair Competition (Fye and Black Label Breaks LLC)

35. To prevail on a claim of false designation of origin and unfair competition under Section 43(a) of the Lanham Act, a plaintiff must prove that the defendant used in commerce, in connection with any goods or services, any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, which is likely to deceive as to the affiliation, connection, or association of the defendant with the plaintiff, or as to the origin, sponsorship, or approval, of the defendants' goods by the plaintiff. *Nola Spice Designs, L.L.C. v. Haydel Enters.*, 783 F.3d 527, 547 (5th Cir. 2015) (citing 15 U.S.C. § 1125(a)(1)(A)). "In determining liability of Section 43(a), the Supreme Court has held that 'the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks. . . .'" *Better Keiki,*

[13] With redemption cards, the owner exchanges or "redeems" the card with the manufacturer and receives a "hit" (typically, autographed) card at a later date. https://ripped.topps.com/definition/redemption-card/

*LLC v. MairicoDirect,* 2018 U.S. Dist. LEXIS 204167, at *9 (E.D. Tex. Oct. 23, 2018) (quotation omitted).

36. Courts assess the likelihood of confusion using "a non-exhaustive list of so-called 'digits of confusion,'" which include:

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, . . . (7) any evidence of actual confusion[,] [and] (8) the degree of care exercised by potential purchasers.

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017) (quoting *Bd. of Supervisors v. Smack Apparel Co.,* 550 F.3d 465, 478 (5th Cir. 2008)). "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Id.*

37. Fye and Black Label Breaks have been using the BLB Group—owned by Limelight—to sell their own products and passing them off as Limelight and/or BLB Group authorized sales. Limelight owns a common law trademark on the "Black Label Breaks" moniker, having purchased the BLB Group as part of Fye Sports Cards' bankruptcy. Fye's new limited liability company, Black Label Breaks, LLC, is identical to the "Black Label Break" group. This has caused actual and damaging confusion in the marketplace, as customers have mistakenly paid Limelight for purchases made from Fye and Black Label Breaks.

**B. COUNT TWO – Trade Secret Misappropriation under Defend Trade Secrets Act (Fye and Black Label Breaks LLC)**

38. Under the federal Defend Trade Secrets Act ("DTSA"), "a court may grant an injunction to prevent any actual or threatened misappropriation . . . of a trade secret . . . on such terms as the court deems reasonable." *Back-Up Sys. Maint., LLC v. Suarez*, No. 4:21-CV-521-SDJ, 2022 U.S. Dist. LEXIS 105110, at *15 (E.D. Tex. June 13, 2022) (citing 18 U.S.C. §

1836(b)(3)(A)(i)). The elements of a trade secret misappropriation claim are "(1) ownership of a trade secret that (2) has been misappropriated and that (3) relates to a product or service in interstate commerce." *Id.* at *12 (citing *Providence Title Co. v. Truly Title, Inc.*, 547 F.Supp.3d 585, 594 (E.D. Tex. 2021 July 1, 2021)).

39. To the extent BLB Group constitutes a trade secret, Limelight owned the BLB Group when it purchased all of Fye Sports Cards' assets. Fye and Black Label Breaks misappropriated the BLB Group. Fye and Black Label Breaks' misappropriation has caused Limelight injury, for which Limelight seeks injunctive relief and economic damages. Moreover, on information and belief, Fye and Black Label Breaks have used the BLB Group to transact sales in interstate commerce.

**C. COUNT THREE – Violation of the Confirmation Order (All Defendants)**

40. A violation of a confirmation order requires clear and convincing evidence that: 1) a court order was in effect; 2) the order required certain conduct by the respondent; and 3) the respondent failed to comply with the court's order. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). Moreover, "[i]t is well-settled that a court's contempt power extends to non-parties who have notice of the court's order and the responsibility to comply with it." *Chicago Truck Drivers v. Bhd. Labor Leasing*, 207 F.3d 500, 507 (8th Cir. 2000) (quoting *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 325 (1904) ("The Supreme Court has long recognized that a person, 'not a party to the suit, [may be] guilty of contempt for violation of an order of that court, made in such suit, and imposing a fine for such contempt.'")). "And Judge Learned Hand explained that, while no court can make a decree that binds 'the world at large,' a non-party 'may be punished if he either abet[s] the defendant or [is] legally identified with him.'" *Id.* (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930)).

41. The Bankruptcy Court's Confirmation Order was in effect as of September 27, 2024. The *Amended Subchapter V Plan of Reorganization of Fye Sports Cards, LLC* [Cause No. 24-31613, Dkt. No. 67], as modified by the Confirmation Order, required the Wind-Down Debtor to take "any action necessary or appropriate to implement, effectuate, and consummate the Plan and any transactions contemplated thereby or by this Order." One of the transactions contemplated—and indeed, substantially effectuated—was the transfer of Fye Sports Cards' assets to Limelight. These assets included the BLB Group and all related intellectual property. Fye, who has knowledge of the Confirmation Order, Plan, and Asset Purchase Agreement, has interfered with the effectuation of the Confirmation Order by removing Limelight's access to the BLB Group. Fye's interference was aided, abetted, and enabled through Cox and Black Label Breaks, making Cox and Black Label Breaks equally liable and in contempt of the Confirmation Order.

### D. COUNT FOUR – Trade-Secret Misappropriation under Texas Uniform Trade Secrets Act (Fye and Black Label Breaks LLC)

42. A claim for trade-secret misappropriation under the Texas Uniform Trade Secrets Act ("TUTSA") requires proof that: (1) plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the misappropriation caused injury, if the plaintiff seeks damages.

43. To the extent the BLB Group constitutes a trade secret, Limelight owned the BLB Group when it purchased all of Fye Sports Cards' assets. Fye and Black Label Breaks misappropriated the BLB Group. Fye and Black Label Breaks' misappropriation has caused Limelight injury, for which Limelight seeks injunctive relief and economic damages.

### E. COUNT FIVE – Common Law Misappropriation and Unfair Competition (Fye and Black Label Breaks LLC)

44. The elements of the tort of unfair competition by misappropriation, also called "common-law misappropriation" are: (1) the creation of plaintiff's product through extensive time,

labor, skill, and money; (2) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (*i.e.*, a ‘free ride’) because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff. Relationships, confidential information, and trade secret information can constitute a “product” for purposes of common law misappropriation/unfair competition.

45. Fye misappropriated the BLB Group from Limelight, after Limelight had lawfully purchased it from Fye Sports Cards. BLB Group was created through extensive time and effort, which Limelight paid valuable consideration for. Fye, and by extension Black Label Breaks, have received a “free ride” through their control of the BLB Group and their exclusion of Limelight. Fye and Black Label Breaks have since used the BLB Group to unfairly compete with Limelight. Fye and Black Label Breaks’ misappropriation of the BLB Group has caused commercial damage to Limelight.

**F. COUNT SIX – Breach of Fiduciary Duty (David Fye)**

46. A claim for breach of fiduciary duty requires proof that: (1) the plaintiff and defendant had a fiduciary relationship, (2) the defendant breached its fiduciary duty to the plaintiff, and (3) the defendant’s breach proximately caused injury to the plaintiff or result in a benefit to the defendant. Importantly, certain fiduciary duties continue post-termination of an employee. *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 602 (Tex. App.—Amarillo 1995, no writ) (noting that former employee was free to compete with former employer “but not with the material developed by or on behalf of” former employer); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ) (“But it is well established that even without an enforceable contractual restriction ‘a former employee is precluded from using for his own advantage, and to the detriment of his former employer, confidential information or trade secrets

acquired by or imparted to him in the course of his employment.'") (quoting *Johnston v. American Speedreading Academy, Inc.*, 526 S.W.2d 163, 166 (Tex. Civ. App.—Dallas 1975, no writ)).

47. Fye breached his fiduciary duties to Limelight. The duties breached include but are not limited to duty of loyalty and utmost good faith; duty of candor; and duty to act with integrity of the strictest kind. Fye's breaches have injured Limelight, as described herein.

**G. COUNT SEVEN – Tortious Interference with Existing and Prospective Relations (All Defendants)**

48. A claim for tortious interference with existing and prospective relations requires proof that: (1) there was a then existing or reasonable probability that the plaintiff would have entered into a business relationship with a third person; (2) the defendant intentionally interfered with the relationship; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff's injury; and (5) the plaintiff suffered damage or loss.

49. Limelight both had, and in reasonable probability would have, business relationships with its then existing and potential clients, including specifically those clients within the BLB Group. All Defendants, acting in concert, interfered with these relationships by disparaging Limelight, excluding Limelight's' access to the BLB Group, and using Limelight's intellectual property to improperly compete with Limelight, injuring Limelight's financial welfare, and indicating to Limelight's clients that they should deal with the Defendants based on mal or misrepresentations.

**H. COUNT EIGHT – Texas Theft Liability Act (Fye)**

50. Under the Texas Theft Liability Act ("TTLA"), "a person who commits theft is liable [civilly] for the damages resulting from the theft." *See* TEX. CIV. PRAC. & REM. CODE §§ 134.002(2), 134.003(a). Section 31.03(a) of the Penal Code defines theft as "unlawfully appropriat[ing] property with intent to deprive the owner of property." TEX. PENAL CODE §

31.03(a). Appropriation occurs when the act is without the consent of the owner of the property. TEX. PENAL CODE § 31.03(b)(1).

51. Fye, as described herein, unlawfully appropriated Limelight's property, including specifically the BLB Group and Limelight's WhatNot account. Fye did so with the intent to deprive Limelight of the use and benefit of this property, and Limelight has suffered damages as a result.

## VI.
## VICARIOUS LIABILITY

### A. VICARIOUS LIABILITY – Civil Conspiracy (All Defendants)

52. A claim for civil conspiracy requires proof that: (1) the defendant was a member of a combination of two or more persons; (2) the object of the combination was to accomplish (i) an unlawful purpose, or (ii) a lawful purpose by unlawful means; (3) the members had a meeting of the minds of the object or course of action; (4) one of the members committed an unlawful, overt act to further object or course of action; and (5) the plaintiff suffered injury as a proximate result of the wrongful act.

53. All Defendants were party to a conspiracy for: (1) Fye to breach his fiduciary duties to Limelight; (2) Fye and Black Label Breaks to tortiously interfere with Limelight's existing and prospective relations; (3) Fye and Black Label Breaks to falsely designate the origin of Fye/Black Label Breaks' products and unfairly compete with Limelight; and (4) Fye to misappropriate the BLB Group (under common law, the Texas Uniform Trade Secrets Act, and the Defend Trade Secrets Act) and unfairly compete with Limelight. The Defendants had a meeting of the minds regarding these objects and courses of action, after which Fye and Black Label Breaks executed on the Defendants' plans. As a result of this conspiracy, Limelight was injured.

**B. VICARIOUS LIABILITY – Aiding and Abetting (All Defendants)**

54. A claim of aiding and abetting requires proof that: (1) the primary actor committed a tort; (2) the defendant had knowledge that the primary actor's conduct constituted a tort; (3) the defendant had the intent to assist the primary actor in committing the tort; (4) the defendant gave the primary actor assistance or encouragement; and (5) the defendant's assistance or encouragement was a substantial factor in causing the tort.

55. In the alternative that no conspiracy is found, all Defendants aided and abetted: 1) Fye to breach his fiduciary duties to Limelight; (2) Fye and Black Label Breaks to tortiously interfere with Limelight's existing and prospective relations; (3) Fye and Black Label Breaks to falsely designate the origin of Fye/Black Label Breaks' products and unfairly compete with Limelight; and (4) Fye to misappropriate the BLB Group (under common law, TUTSA, and DTSA) and unfairly compete with Limelight. Cox was aware of Fye and Black Label Breaks' tortious conduct, and had the intent to—and did in fact—assist them with their tortious conduct. Cox and Black Label Breaks' assistance was a substantial factor in causing the various torts by Fye, alleged herein.

**C. VICARIOUS LIABILITY – Alter-Ego (Fye and Black Label Breaks)**

56. A corporate veil can be pierced if a corporation is operated as a mere tool or business conduit of another person or another corporation. Alter ego requires the plaintiff prove: (1) there is some financial interest, ownership, or control by the defendant; (2) there is unity between the would-be alter egos; and (3) holding only the corporation liable would result in injustice.

57. Fye has a financial interest in, ownership of, and control over Black Label Breaks. Fye's use of Black Label Breaks as his tool to effectuate his tortious intentions and plans evidences

a unity between Fye and Black Label Breaks. Holding only Fye or Black Label Break liable would result in an injustice.

## VII.
## DAMAGES

58. Plaintiff seeks recovery of its actual damages, including its loss of goodwill and lost profits. Plaintiff also seeks exemplary damages for defendants' acts which were committed with malice or through fraud.

59. Plaintiff requests the court award it prejudgment and postjudgment interest, and the court costs it incurs.

60. Plaintiff seeks its attorney fees under Tex. Civ. Prac. & Rem. Code §§ 134.005(b), 134A.005(2), and 18 U.S.C. § 1836(b)(3)(D).

## VIII.
## REQUEST FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

61. Plaintiff requests a temporary restraining under pursuant to Fed. R. Civ. P. 65.

62. Preliminary injunctive relief is proper where, as here, the movant shows (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

63. The Fifth Circuit has discussed the sliding scale in evaluating both likelihood of success related to the likelihood of irreparable harm and finding that the greater likelihood of one resulted in less being required in the other. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576–77 (5th Cir. 1974). The Fifth Circuit, in *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.,* also stated that irreparable harm was a harm "for which there is no adequate remedy at law." 710 F.3d 579, 585 (5th Cir. 2013). An adequate remedy at law can be as simple

as monetary damages, but the availability of such monetary damages may not be an actual adequate remedy at law. *Lee v. Bickell*, 292 U.S. 415 (1934); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

64. Recently, the Southern District of Iowa dealt with a similar request for injunctive relief in *Blue Compass RV, LLC v. Jensen*, No. 4:24-CV-00392-RGE-SBJ, 2024 WL 5440855 (S.D. Iowa Nov. 26, 2024). In *Blue Compass*, the plaintiff moved for a preliminary injunction ordering a former employee to return administrator control over two Facebook Groups belonging to the plaintiff. *Id.* at *1. The plaintiff alleged one of its former employees: (1) created and maintained the Facebook Groups in the course of his employment, which was subject to a contract pledging all forms of work-related intellectual property to the plaintiff; (2) the defendant, while working for plaintiff, obtained control over the Facebook Groups and operated the Facebook Groups for plaintiff's benefit; and (3) control of the Facebook Groups was transferred to another non-employee defendant, who competed with plaintiff, near the time of the defendant employee's termination. *Id.* The Facebook Groups were also used by plaintiff' salespersons to list inventory and develop customer leads. *Id.* at *2.

65. In Blue Compass's complaint, Blue Compass brought claims for, among other things, breach of contract, conversion, unfair competition, tortious interference with prospective and existing contract relations, violations of the Defend Trade Secrets Act, trademark infringement under Section 1125 of the Lanham Act, and trademark infringement under Section 1114 of the Lanham Act. *Id.* at 4. In response, the defendants claimed the Facebook Groups were not intellectual property subject to the pledge in the employment agreement. *Id.*

66. The Southern District of Iowa found the Facebook Groups were "created for and in the course of employment by [the defendant], administered by [the defendant] in the course of his

employment . . . and at all times protected through account identification names and passwords [used to administer the account].” *Id.* at *5. The court further relied on the Facebook Groups being “not entirely public . . . [and while the Facebook Groups were] public facing, [] administrator control is private, password protected and, according to all parties, valuable.” *Id.* Moreover, the court concluded “the information presented by the parties demonstrate[d] that [defendant] understood the Groups and the confidentially maintained access to administrator-level control of the Groups comprised confidential information of value used by [the] employer . . . through the [defendant] employee[.]” *Id.*

67. Ultimately, the court concluded control of the Facebook Groups should vest in Blue Compass:

> Lopez created and maintained the Groups for Blue Compass's purposes while employed by Blue Compass. Jensen continued to maintain and develop the Groups for Blue Compass's purposes after Lopez's departure. These efforts caused the Groups to grow in value as the user base grew. Given the breadth of the pledge of intellectual property in the Lopez and Jensen Agreements and the clarity of the prohibition on the dissemination of confidential information in the Jensen Agreement, the Court finds this preliminary record sufficient to establish Blue Compass's right to control the Groups.

*Id.* at *6. The Southern District of Iowa then concluded Blue Compass had presented a likelihood of success on its tortious interference claims, that irreparable harm could ensue given “there are no reliable means by which to measure [the parties] relative abilities to capitalize on opportunities that might arise from control of the Groups” and the “risk of destruction attendant to control over the Groups by an adverse party,” and that the balance of equities and public interest favored returning control to Blue Compass. *Id.* at *7. The Southern District of Iowa then ordered the defendants to: (1) preserve and not disclose all electronically stored data relating to the Facebook Groups; and (2) return control of the Facebook Groups to Blue Compass within twenty-four hours, requiring a bond of $2,500. *Id.* at *8.

68. Here too, the Court should issue injunctive relief returning the BLB Group and WhatNot account to Limelight. As described below, and as supported by the Declaration of Limelight's Corporate Representative, the factors weigh in favor of issuing a temporary restraining order, preliminary injunction, and ultimately a permanent injunction.

**A. Limelight has shown a likelihood of success on the merits.**

69. Limelight has pled various causes of action, each with sufficient evidence to show a likelihood of success on the merits.

**i. *False Designation of Origin and Unfair Competition***

70. Fye and Black Label Breaks have used in commerce the BLB Group to compete with Limelight and deceive consumers and the marketplace to believe Fye and Black Label Breaks are sanctioned sales by Limelight. Fye and Black Label Breaks' actions have caused actual confusion in the marketplace, with customers mistakenly transferring funds to Limelight for purchases made from Fye and Black Label Breaks.

**ii. *Misappropriation, Theft, and Trade Secret Claims***

71. As is evident through the facts described herein, supported by Limelight's declaration, the BLB Group is a valuable product that Limelight paid valuable consideration for. The BLB Group comprised a large portion of Limelight's sales and is now being used by Fye and Black Label Breaks to actively compete with Limelight. The BLB Group was created through extensive time and labor, and Fye's use of the BLB Group has given Fye a "free ride" since Fye (through Fye Sports Cards) was compensated when Limelight purchased the BLB Group. Fye's misappropriation of the BLB Group has caused commercial damage to Limelight. This similarly applies to Limelight's WhatNot account.

**iii. *Violation of Confirmation Order***

72. The first two elements for contempt are indisputable. The Confirmation Order was in effect at the time that Fye absconded with the BLB Group. The Confirmation Order required Fye Sports Cards, including Fye, to effectuate the transfer of all of Fye Sports Cards' assets—specifically its intangible and intellectual property—to Limelight. Fye, as the representative and former owner of Fye Sports Cards during its bankruptcy, was aware of the Confirmation Order's requirements, and Fye in fact signed the Asset Purchase Agreement on behalf of Fye Sports Cards. Fye has violated and interfered with the operation of the Confirmation Order by entirely removing Limelight's access and control over the BLB Group.

**iv. *Breach of Fiduciary Duty***

73. Limelight's claim for breach of fiduciary duty is likewise likely to succeed on the merits. Limelight employed Fye after Limelight purchased Fye Sports Cards. As an employee, Fye was prohibited from "using for his own advantage and to the detriment of his former employer, confidential information or trade secrets acquired by or imparted to [Fye] in the course of his employment." *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 551 (Tex. App.—Dallas 1993, no writ) (citing *Johnston v. American Speedreading Academy, Inc.*, 526 S.W.2d 163, 166 (Tex. Civ. App.—Dallas 1975, no writ). Fye breached this duty when he removed Limelight's access to the BLB Group, which Fye was only able to do because he was made an administrator during his employment with Limelight, and used the BLB Group to compete with Limelight. Fye's breach of this fiduciary duty has injured Limelight in terms of lost sales, lost goodwill, and reputational damage. It has also resulted in a benefit to Fye as he began (and continues) to use the BLB Group exclusively for his own business transactions.

v. ***Tortious Interference***

74. The evidence also clearly goes to show Limelight had existing, and likely would have additional, relations with customers within the BLB Group. Limelight was already conducting sales within the BLB Group on a steady basis, and Limelight's sales after it was ousted from the BLB Group have sharply declined. Fye intentionally removed Limelight from the BLB Group, and doing so was an independently tortious misappropriation of Limelight's confidential information, trade secret, and property. Fye's doing so proximately and directly caused injury to Limelight in the form of lost sales, not to mention lost goodwill and reputation.

**B. Limelight will likely suffer irreparable harm without injunctive relief.**

75. "In trademark infringement cases, many courts presume the existence of an irreparable injury if the plaintiff establishes a substantial likelihood of confusion." *Sparrow Barns & Events, LLC v. Ruth Farm Inc.*, 2019 U.S. Dist. LEXIS 61515, at *22 (E.D. Tex. Apr. 10, 2019) (citations omitted). Indeed, the Fifth Circuit has opined that irreparable injury can be presumed based on a showing of a likelihood of confusion. *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) ("[a]ll that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion—injury is presumed").

76. Where a competitor has trade secrets gained through a prior relationship, without restriction against use or disclosure, the "fear of irreparable injury is realistic." *FMC Corp. v. Varco Intern., Inc.*, 677 F.2d 500, 505 (5th Cir. 1982); *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.) ("When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed.")

77. Accordingly, the Court is entitled to presume Limelight will suffer irreparable harm based on Limelight's strong showing of a likelihood of confusion given Defendants obtaining and using BLB Group in forming and operating a competing entity. Moreover, aside from the

intellectual property issues, the unfair competition and mal and misrepresentations that are ongoing from Defendants continue to cause reputational and goodwill injuries which many times are "impossible to calculate." *See ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 697 (N.D. Tex. 2015) (citing *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014)).

**C. The equities favor Limelight.**

78. The Court must "exercise discretion to determine whether the movant's . . . harm is not outweighed or equal to that of the [non-movant] and, if so, then a preliminary injunction may be issued." *In re OGA Charters, LLC*, 554 B.R. 415, 425–26 (Bankr. S.D. Tex. 2016). Fye has no claim of right to the BLB Group. However, Limelight has shown a persistent decline in sales, and reputational and goodwill damages. The equities clearly favor Limelight, weighing in favor of a temporary restraining order.

**D. The public interest factor favors Limelight.**

79. Finally, the public has an interest in the prompt issuance of an order against Defendants to prevent consumers from being misled. Put simply, preventing consumer confusion is the gravamen of trademark law. *Xtreme Lashes,* 576 F.3d at 229 (5th Cir. 2009); *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985). To that end, a preliminary injunction will promptly prevent consumer confusion and deception in the marketplace.[14]

80. Plaintiff requests that this Court enter a temporary restraining order and a temporary and permanent injunction requiring Defendants and their agents, servants, and employees to:

(a) Transfer administrative rights to the Black Label Breaks Facebook group from Fye or any of his associates to Limelight;

[14] Although Limelight is willing to post a bond in the amount the Court deems appropriate, courts may waive the bond requirement or require only a nominal bond where, as here, the trademark owner's case is strong. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171 (6th Cir. 1995).

(b) Transfer control of the Limelight WhatNot account to Limelight;

(c) Execute correspondence to certain card manufacturers listing the shipping address for Limelight's redemption cards to Limelight's address;

(d) Preserve all posts, messages, or other digital information relating to the Black Label Breaks Facebook group;

(e) Refrain from posting within the Black Label Breaks Facebook group any business transactions or posts relating to this litigation; and,

(f) Ceasing from any other action that would result in injury or harm to Plaintiff.

81. Plaintiff is prepared and willing to post a bond in connection with this Court's issuance of a temporary restraining order and temporary injunction. However, The Fifth Circuit has held that the district court has the discretion to "require no security at all." *See e.g., Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996); *see also Corrigan Dispatch v. Casa Guzman, S.A.*, 569 F.2d 300 (5th Cir. 1978). Given the strength of Plaintiff's claims and given that any damages Defendants would suffer would relate to improper gains received through absconding with the BLB Group, Plaintiff requests the Court exercise said discretion and require no bond at all.

## IX.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that Defendants be cited and, after a hearing for the injunctive relief and after trial or other final hearing on the merits, as appropriate, the Court:

(a) Grant Plaintiff's application for the temporary restraining order and temporary injunctive relief as requested above;

(b) Enter judgment for Plaintiff as requested above and award Plaintiff their damages, expenses, and costs incurred in connection with this action; and

(c) All such other and further relief, both general and special, at law or in equity, to which Plaintiff may show itself justly entitled.

RESPECTFULLY SUBMITTED,

**JACKSON WALKER LLP**

BY: */s/ Javier Gonzalez*
Veronica A. Polnick
Texas State Bar No. 24079148
S.D. Texas Bar No. 1321826
vpolnick@jw.com
Javier Gonzalez
Texas State Bar No. 24119697
S.D. Texas Bar No. 3722324
jgonzalez@jw.com
Tel. (713) 752-4453
1401 McKinney, Suite 1900
Houston, TX 77010

William Farmer
Texas State Bar No. 24127156
S.D. Texas Bar No. 3857272
wfarmer@jw.com
Tel. (214) 953-5674
2323 Ross Ave., Suite 600
Dallas, TX 75201

**ATTORNEYS FOR PLAINTIFF LIMELIGHT TRADING CARDS, LLC**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| LIMELIGHT TRADING CARDS, LLC | § | |
| *Plaintiff,* | § | |
| v. | § | No. ______________ |
| DAVID FYE, LOGAN COX, AND BLACK LABEL BREAKS LLC | § | |
| *Defendants.* | § | |

**DECLARATION OF CORPORATE REPRESENTATIVE FOR LIMELIGHT TRADING CARDS, LLC**

Pursuant to 28 U.S.C. § 1746, I, Dave Wallace, declare as follows under penalty of perjury:

1. I am the President and owner of Limelight Trading Cards, LLC ("Limelight"). Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Limelight's management team, employees, and advisors, my review of relevant documents and information concerning the facts identified herein, or my opinions based upon my experience and knowledge. I am over the age of eighteen (18) and authorized to submit this declaration on behalf of Limelight in my capacity as its corporate representative. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

2. Limelight is a trading card and sports memorabilia dealer business, with an online presence and brick-and-mortar store located in Colleyville, Texas. Limelight was incorporated on January 11, 2023. A majority of Limelight's sales were conducted through online direct-to-consumer sales.

3. In January of 2023, my son and I, as individual patrons, began going to the retail location of Fye Sports Cards LLC ("Fye Sports Cards"), in Colleyville, Texas. We purchased cards frequently from Fye and considered him a friend.

4. In early December 2023, Fye approached me and asked for a short-term business loan of $30,000, that he would pay back in two weeks, because his business was in distress. Instead, I offered to consign a significant number of cards that I had purchased in order to keep his shop in business while he filed bankruptcy. I continued to make a significant investment of consignment cards to Fye and his business, with values in the hundreds of thousands of dollars. I did so both because Fye was a friend and to help Fye Sports Cards stay afloat given its financial difficulties. Fye Sports Cards eventually filed for bankruptcy in early 2024.

5. In late 2024, after Fye Sports Cards had filed for bankruptcy, Limelight, via myself, approached Fye regarding the potential purchase of Fye Sports Cards' inventory. Eventually, as negotiations progressed, the purchase transformed from a simple inventory purchase to essentially purchasing the entire business. Limelight purchased all of the assets of Fye Sports Cards, including all of its inventory and all of its other assets, both tangible and intangible. In fact, Fye Sports Cards' brick-and-mortar store in Colleyville has since become Limelight's flagship store.

6. Importantly, Limelight was interested in Fye Sports Cards' online presence. Fye Sports Cards had created a valuable online persona, through the Black Label Breaks Facebook group (the "BLB Group"), Fye Sports Cards' other social media accounts, and their storefronts on WhatNot and eBay. This online presence was a driving force in Limelight's interest in purchasing all of Fye Sports Cards' assets and not just the inventory.

7. The BLB Group is a closed and private Facebook group with more than 6,000 members. Being private, non-members are unable to look at posts within the group, the group's

members, or interact within the group. Being a closed group means users have to request an administrator or moderator to admit the user into the group.

8. The BLB Group was routinely used to post inventory for sale and otherwise promote Fye Sports Cards's business. I am personally aware of this as I was individually a member (as was Limelight) of the BLB Group prior to this dispute arising.

9. Limelight's purchase of Fye Sports Cards' business was memorialized in an Asset Purchase Agreement between Limelight and Fye Sports Cards. Limelight paid $30,000 to the Fye Sports Cards' bankruptcy estate for "all of the tangible and intangible assets and property of [Fye Sports Cards], wherever located including but not limited to intellectual property, whether or not specifically scheduled."

10. The Asset Purchase Agreement, and the contemplated sale of Fye Sports Cards, was approved by the Bankruptcy Court on September 27, 2024. Soon thereafter, Limelight paid the purchase price of $30,000 to the Bankruptcy Estate.

11. Following the approval of the Assert Purchase Agreement, Fye began transferring all of Fye Sports Cards' assets to Limelight and its personnel. Specifically, Fye transferred control and administrator rights to the BLB Group to Limelight. Fye also transferred control of Fye Sports Cards' Facebook, Instagram, and X (f/k/a Twitter) pages, and its eBay and WhatNot storefronts. This transition was even announced on these social media pages and groups by Fye himself.

12. Slowly, Limelight began rebranding all of Fye Sports Cards' pages and online personas to Limelight. This included control, administration, and use of the BLB Group. Limelight began using the BLB Group to promote its business, effectuate sales, and continue to build Limelight's online presence and community.

13. As part of Fye Sports Cards' transition, Fye himself stayed onboard as a Limelight employee. Fye's role was as the purchasing manager, which responsibilities included having a managerial role at Limelight, with many of the employees deferring and referring to him in day-to-day operations. Part of Fye's new role also included working directly with Limelight's outsourced marketing firm to rebrand Limelight's social media pages, website, and literature, including the BLB Group. Fye had—to an extent—become associated with Limelight.

14. Fye's transition to Limelight was not without issues. Indeed, Fye would routinely violate Limelight's protocols. Fye received warnings for the following actions:

(a) Fye disregarded instructions and released customer checks to someone besides the customers. Fye did so despite clear instructions the week before not to do so.

(b) I personally instructed Fye that he was not authorized to make PayPal payments that exceed $500, without approval, after he exceeds his $2,000 weekly budget. Fye then sent a PayPal payment the following week in excess of $4,000.

(c) Fye was instructed to ensure the posting of product sales on the BLB Group. Fye failed to do so, failing to both post any sales or manage the BLB Group per Limelight's protocol. When Limelight management attempted to work with Fye to fulfill his duties, Fye refused, and instead told Limelight's management to find someone else to complete the tasks.

(d) Fye failed to properly, accurately, or timely record multiple orders of product that arrived. Fye's failures lead to a significant time-cost as other members of the team were required to reconcile the system.

15. Given these issues, Limelight management met with Fye on or about February 13, 2025, to discuss a go-forward plan. In the process of Limelight management meeting with Fye to reprimand his actions, Fye made several comments indicating he was already set on resigning. Prior to the meeting commencing, Fye mentioned to Limelight management that they could always "contact [Fye] if they ever need anything." Once the meeting began, Fye abruptly resigned and left, reiterating the same remark.

16. The next day, on February 14, 2025, Fye removed all Limelight personnel's moderator and administrator privileges from the BLB Group. Fye then began to post his own business offerings (*e.g.* trading cards for sale) on the BLB Group. Fye eventually entirely removed all Limelight personnel from the BLB Group on February 18, 2025.

82. Following Limelight's ouster from the BLB Group, Limelight's sales have sharply declined. The following table shows the decline in Limelight's sales:

| **Month** | **Gross Sales** |
|---|---|
| 12/01/2024 – 12/07/2024 | $67,818.16 |
| 12/08/2024 – 12/14/2024 | $76,278.79 |
| 12/15/2024 – 12/21/2024 | $112,213.31 |
| 12/22/2024 – 12/28/2024 | $84,747.13 |
| 12/29/2024 – 01/04/2025 | $77,431.57 |
| 01/05/2025 – 01/11/2025 | $114,441.32 |
| 01/12/2025 – 01/18/2025 | $83,089.39 |
| 01/19/2025 – 01/25/2025 | $74,463.42 |
| 01/26/2025 – 02/01/2025 | $45,272.84 |
| 02/02/2025 – 02/08/2025 | $76,436.41 |
| 02/09/2025 – 02/15/2025 | $74,221.92 |

| **Month** | **Gross Sales** |
|---|---|
| **OUSTER** | |
| 02/16/2025 – 02/22/2025 | $30,748.14 |
| 02/23/2025 – 03/01/2025 | $35,484.99 |
| 03/02/2025 – 03/08/2025 | $25,462.24 |
| 03/09/2025 – 03/15/2025 | $36,596.96 |
| 03/16/2025 – 03/22/2025 | $22,769.86 |
| 03/23/2025 – 03/29/2025 | $28,594.36 |

As a result of Limelight's ouster from the BLB Group, Limelight's weekly sales have decreased, on average, ***61 percent*** and roughly $280,000 in lost revenue to date, and growing.

17. Fye's interference with Limelight does not stop there. Limelight has also suffered reputational and goodwill injury following the ouster. Fye has routinely disparaged Limelight to existing and potential customers by spreading falsities regarding Fye's departure from Limelight,

resulting in several customers indicating to Limelight personnel that they would "never do business with Limelight again after what they did to Fye."

18. Fye's taking over of the BLB Group has also resulted in confusion in the marketplace. Several customers have mistakenly sent Limelight money for items purchased from Fye, which Limelight then had to refund.

19. If Fye's interference and control over the BLB Group does not cease in the immediate future, Limelight will be irreparably harmed. Limelight's reputation will be tarnished, Limelight's source of sales will be absconded, and Limelight's business will be injured.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of April 2025.

*/s/ Dave Wallace*______________________
Dave Wallace
President

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| LIMELIGHT TRADING CARDS, LLC | § | |
| *Plaintiff,* | § | |
| v. | § | No. _______________ |
| DAVID FYE, LOGAN COX, AND BLACK LABEL BREAKS LLC | § | |
| *Defendants.* | § | |

**<u>TEMPORARY RESTRAINING ORDER</u>**

Before the Court is the Plaintiff's Original Complaint and Application for Injunctive Relief [Dkt. No. 1] ("<u>Application</u>") filed by Plaintiff Limelight Trading Cards, LLC against Defendants David Fye, Logan Cox, and Black Label Breaks LLC. After considering the Application, supporting affidavit, accompanying exhibits, and argument of Counsel, if any, the Court makes the following findings:

The Court FINDS that it clearly appears from the facts set forth in the Application and affidavit that harm is imminent to Plaintiff Limelight Trading Cards, LLC and if the Court does not issue a temporary restraining order against Defendants, then Plaintiff Limelight Trading Cards, LLC will be irreparably harmed and will suffer immediate and irreparable injury for which it has no adequate remedy at law. Accordingly, the Court finds that it should enter this temporary restraining order against Defendants and anyone acting in concert with Defendants or agents thereof.

The Court further FINDS that notice of the hearing on the Application was timely served on Defendants.

The Court further FINDS that it clearly appears from the Application and affidavit that if Defendants are not restrained, Plaintiff Limelight Trading Cards, LLC will suffer immediate and irreparable injury including: (1) reputational harm; (2) loss of goodwill; and (3) confusion in the marketplace. The Court's finding of immediate and irreparable harm and injury is based on this Court's conclusion from the facts set forth in the Application detailing the irreparable harm.

The Court further FINDS Plaintiff has demonstrated a likelihood of success on the merits for its claims of: (1) violation of the Confirmation Order; (2) breach of fiduciary duty; (3) tortious interference with existing and prospective relations; (4) false designation of origin and unfair competition; (5) common law misappropriation and unfair competition; (6) trade secret misappropriation under the Texas Uniform Trade Secrets Act and Defend Trade Secrets Act; and (7) the Texas Theft Liability Act.

The Court further FINDS the equities favor the issuance of this temporary restraining order.

The Court further FINDS the public interest factor favors the issuance of this temporary restraining order.

THEREFORE, IT IS HEREBY ORDERED that Plaintiff Limelight Trading Cards, LLC's request for a Temporary Restraining Order is GRANTED. Defendants, as well as any officers, agents, employees, attorneys, and all other persons in active concert or participation with them who receive actual notice of the order, are required to:

(1) Transfer administrative control of the Black Label Breaks Facebook group to Limelight by 5:00PM of the day following the signing of this Temporary Restraining Order;

(2) Transfer administrative control of the Limelight WhatNot account to Limelight by 5:00PM of the day following the signing of this Temporary Restraining Order;

(3) Execute correspondence to Panini and Topps identifying Limelight's redemption cards and changing the shipping address to Limelight's shipping address;

(4) Cease all communications with: (1) all prior or current customers of Limelight, Fye, or Fye Sports Cards; (2) the BLB Group or members of the BLB Group; and (3) third parties connected to BLB Group or industry, regarding Limelight, Fye's departure from Limelight, and this litigation.

It is further ORDERED that unless terminated earlier, this Temporary Restraining Order shall expire fourteen (14) from the date of the hour of signing, unless within the time limit set out above, the Court extends the effectiveness of this Order in compliance with applicable law or it is extended by agreement of the parties, and then at that time the Order shall expire upon a ruling of the temporary injunction.

It is further ORDERED that bond in this case shall be waived.

It is further ORDERED that the Clerk shall issue a Temporary Restraining Order in conformity with the law and terms of this Order.

It is further ORDERED that Defendants shall appear before the United States District Court for the Southern District of Texas—Houston Division, on the _____ day of ________, 2025, at ___________ a.m./p.m., at which time Plaintiff Limelight Trading Cards, LLC's application for a temporary injunction shall be heard.

This Temporary Restraining Order is signed and shall become immediately effective as of the date of signing indicated below. The Plaintiff's shall immediately serve a copy of this Temporary Restraining Order on counsel for the Defendant.

Signed on this ___ day of _______, 2025, at ________ a.m./p.m.

______________________________
JUDGE PRESIDING