United States District Court
Southern District of Texas
**ENTERED**
May 28, 2025
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Limelight Trading Cards, LLC | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action 4:25-cv-1562 |
| | § | |
| David Fye, Logan Cox, and Black | § | |
| Label Breaks LLC, | § | |
| *Defendants.* | § | |

## MEMORANDUM AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1). ECF No. 3. Plaintiff Limelight Trading Cards, LLC (Limelight) moved for a preliminary injunction to require Defendant David Fye (Fye) to return to Limelight control over a WhatNot[1] account, a Facebook Group, and certain "redemption" cards. ECF No. 1. On April 30, 2025, the undersigned held a hearing on the motion. Based on the evidence and testimony presented at the hearing, the court enters the following findings of fact[2] and conclusions of law.

The court recommends that the request for preliminary injunction be **GRANTED** in part as to the Fye Sports Cards Facebook Page, the Fye Sports Cards Whatnot account, and any redemption cards that Fye Sports Cards, LLC acquired during its existence. The request for preliminary injunction should be **DENIED** in part as to the BLB Group.

---

[1] "Whatnot" is an online marketplace, similar to a "live" version of eBay. Sellers can use Whatnot to auction cards. ECF No. 26 at 76.

[2] To the extent that there is a conflict in the evidence, the factual conclusions herein reflect the court's credibility determinations.

## 1. *Background*

### A. *David Fye and Fye Sports Cards*

David Fye is a baseball card enthusiast. ECF No. 26 at 128. In February 2020, Fye created a Facebook group called Black Label Breaks (BLB) which advertises itself to be "a sports card group helping bring the hype back to the hobby!" ECF No. 24-2 at 3. BLB is a private group, meaning that only members of the group can see what is posted within the group. *Id.* at 4. As of April 2025, BLB had 6,066 members. *Id.* Fye is currently an administrator of the BLB group.

On January 19, 2021, Fye formed Fye Sports Cards, LLC. ECF No. 24-1 at 8. The following year, in August 2022, Fye opened a sports card and rare sports collectible brick-and-mortar retail outlet, Fye Sports Cards, in Colleyville, Texas. ECF No. 26 at 128. Fye Sports Cards possessed a Whatnot account. *Id.* at 75. In December 2023, Fye Sports Cards was experiencing financial difficulties. *Id.* at 131. Fye blames those difficulties on the expense of running a sports card and collectible business, as well as his decision to take out a "bad loan" which "ate away" at the cash flow of his business. *Id.* To resolve those financial problems, Fye was faced with a choice—take out a $250,000 loan or find a financial partner. *Id.*

### B. *The Bankruptcy and the Asset Purchase Agreement*

Fye did not take out the $250,000 loan. ECF No. 26 at 131. Instead, he turned to his "buddy," Dave Wallace (Wallace) *Id.* Wallace is the president of Plaintiff Limelight Trading Cards, LLC, which is a trading card and sports memorabilia business. *Id.* at 10. Starting in January 2023, Wallace and his son became customers at Fye Sports Cards in Colleyville, Texas. They purchased cards there frequently and considered Fye their friend.

ECF No. 1-1 at ₂; ECF No. 26 at 24. Wallace also joined the BLB Group in February or March 2023. ECF No. 26 at 39.

In December 2023, Fye asked Wallace for a personal loan of $30,000 to help save his business. *Id.* at 25. Wallace refused because he was concerned about the financial health of Fye Sports Cards. *Id.* Instead, Wallace consigned to Fye several sports card from Limelight Trading Cards, LLC and his personal collection. *Id.* at 26. Under that arrangement, Fye Sports Cards possessed, marketed, and sold the cards, and the proceeds would be split between the two businesses. *Id.*

On April 10, 2024, possibly at Wallace's suggestion, Fye Sports Cards, LLC, filed for bankruptcy. ECF No. 24-1 at 8; ECF No. 26 at 133. Neither Wallace nor Limelight were named as creditors in Fye Sports Cards, LLC's bankruptcy. ECF No. 26 at 28. However, Limelight was interested in purchasing Fye Sports Cards' assets. *Id.*

Fye Sports Cards, LLC, and Limelight Trading Cards, LLC, entered into an Asset Purchase Agreement which was approved by the Bankruptcy Court on September 27, 2024. ECF No. 24-1 at 2, 4, 36. The Asset Purchase Agreement required the Seller, i.e., Fye Sports Cards LLC, to "sell, transfer, assign, convey, and deliver, or cause to be delivered" to Limelight the "assets." *Id.* at 40. Those assets included "all right, title, and interest of Seller . . . of certain tangible property, including but not limited to those assets described . . . within Schedule I." *Id.* Section 4.03 of the Asset Purchase Agreement defines an "asset" to include "all of the tangible and intangible assets and property of Seller, wherever located including but not limited to intellectual property, whether or not specifically scheduled." *Id.* at 42. Schedule I does not reference the BLB Group or the WhatNot account. *Id.* at 48–52. The Asset Purchase Agreement does not purport to transfer any of

Fye's personal property. It transfers only Fye Sports Cards, LLC's property. *Id.* at 38.

Wallace testified that he understood Section 4.03 to include "all physical assets, all intangible assets, everything related to marketing and selling the cards, and the customer lists." ECF No. 26 at 35. Wallace understood the customer lists to include the members of the BLB Group. *Id.* at 31. Wallace testified that, under the Asset Purchase Agreement, Limelight purchased the BLB Group, the Fye Sports Cards Facebook Page, and the Fye Sports Cards WhatNot account. *Id.* at 36. Wallace explained that he believed that Limelight had purchased the BLB Group because, prior to Limelight's purchase of the Fye Sports Cards assets, Fye Sports Cards was the only entity posting in the BLB Group. *Id.* at 38. As such, he assumed that the BLB Group was an asset that belonged to Fye Sports Cards. *Id.* However, Wallace admitted that the acquisition of the BLB Group was not a "highlight" of conversations between Wallace and Fye. *Id.*

Fye testified that when Limelight and Fye Sports Cards negotiated the asset purchase, there were no discussions regarding the BLB Group because it was separate from Fye Sports Cards. ECF No. 26 at 143. Fye stated that the BLB Group was never part of Limelight's purchase of assets. *Id.* at 144. Fye stated, however, that the Fye Sports Cards Facebook Page as well as the Fye Sports Card Whatnot account were transferred to Limelight pursuant to the Asset Purchase Agreement. *Id.* at 150.

### C. Fye, Limelight, and the BLB Group

Following Limelight's purchase of Fye Sports Cards' assets, on November 26, 2024, Fye Sports Cards announced on its Facebook page (separate from the BLB Group) that it was now Limelight Trading Cards. ECF No. 24-8 at 2; *see also* ECF No. 26 at 43. Fye Sports Cards also changed the logo on its Facebook page to reflect "Limelight Trading Cards." ECF No. 24-8 at 3–4. Fye

himself made these changes and additionally changed the name of the Whatnot account from "Fye Sports Cards" to "Limelight Trading Cards." ECF No. 26 at 36, 51. With Fye Sports Cards dissolved, Fye began working with Limelight to market and sell trading and sports cards. Fye and Wallace disagree about Fye's specific role within Limelight. Wallace maintained at the hearing that Fye was an employee, first as a manager and then as a purchasing manager. ECF No. 26 at 48, 75. Fye stated that he believed he was a partner. *Id*. at 135. Fye added that Limelight provided him with a Form 1099 rather than a W-2. *Id*. at 156. Fye also testified that taxes were never deducted from the checks Limelight gave him each week. *Id*.

Regardless of Fye's specific role within Limelight, he began using the BLB Group to market and sell trading and sports cards on behalf of Limelight. ECF No. 26 at 63. After the Asset Purchase Agreement was executed, Fye granted the Limelight Trading Cards Facebook Page, and Limelight personnel, administrator-level access to the BLB Group. *Id*. at 70. Wallace testified that, while Fye Sports Cards was the only entity posting within the BLB Group *before* Limelight's acquisition of Fye Sports Cards, Limelight was the only entity posting in the BLB Group *after* the acquisition. ECF No. 26 at 49. When Limelight would post in the BLB Group, it made sure that the poster was "Limelight Trading Cards" rather than any individual person, so that members of the BLB Group could see that the sales were associated with Limelight. *Id*. at 50. In fact, Limelight was the only entity—person or business—posting within the BLB Group while Fye worked with Limelight. *Id*. at 84. Wallace testified that 60% to 65% of its weekly sales occurred on the BLB Group. *Id*. at 93.

Though Fye used the BLB Group to advance Limelight's business, he was reluctant to change the name or logo of the BLB Group to reflect Limelight Trading Cards' logo or ownership of the

group. Prior to Fye Sports Cards' announcement that it had become Limelight Trading Cards, Wallace employed the marketing firm, Ill Fusion, to help rebrand Fye Sports Cards. ECF No. 26 at 57. Wallace, Fye, and representatives from Ill Fusion attended several discussions regarding the rebranding. *Id*. Wallace explained that one area of discussion during meetings that Fye attended was the need to rebrand the BLB Group to reflect Limelight's acquisition of Fye Sports Cards. *Id*. at 57–58. Wallace recalled that Fye seemed resistant, raising concerns about confusing members of the BLB Group. *Id*. at 58. However, Wallace stated that Fye never mentioned that these discussions should not happen or that the BLB Group was never transferred to Limelight. *Id*. at 58–59. Fye, however, recalls stating during one of these marketing meetings that the BLB Group did not belong to Limelight and that Wallace disagreed with that statement. *Id*. at 145.

### D. Dissolution of Relationship between Fye and Limelight

On or about February 13, 2025, Limelight management met with Fye to discuss his job performance with Limelight. ECF No. 1-1 at 4. Prior to the meeting, Fye had approached Wallace about his status within Limelight. ECF No. 26 at 145. Fye recalls that Wallace made it clear to Fye that he was not a partner. *Id*. On February 13, 2025, Limelight management presented Fye with several disciplinary writeups stating that Fye had violated various Limelight protocols. *Id*; *see also* ECF No. 1-1 at 4. During the February 13, 2025 meeting, Fye resigned. ECF No. 26 at 145.

On February 14, 2025, after his resignation, Fye began posting in the BLB Group on his own behalf. ECF No. 26 at 84. Fye also removed moderator and administrator privileges to the BLB Group for all of Limelight's personnel. *Id*. at 81–82. Wallace testified that up to this point, only Limelight had posted in the

BLB Group. *Id.* at 84. After Fye began posting in the BLB Group as himself, at least some of the members mistook Fye as posting on behalf of Limelight. ECF No. 24-6 at 2 (showing a post-resignation post from Fye within the BLB Group and a member commenting on the post referencing a Limelight credit system); *see also* ECF No. 26 at 89–90.[3] On February 18, 2025, Fye removed Limelight and Limelight personnel from the BLB Group entirely. ECF No. 1-1 at 5.

Wallace testified that, in addition to removing Limelight from the BLB Group, Fye has also failed to return certain "redemption" cards to Limelight. ECF No. 26 at 95. Redemption cards are trading cards that have not yet been made by the manufacturer. *Id.* at 94. A redemption card effectively represents a promise from the manufacturer that once it has made the card, the purchaser can submit the redemption card to the manufacturer for the actual trading card. *Id.* at 94–95. Redemption cards can be extremely valuable. *Id.* at 95. Before Fye's resignation, the shipping address for many of these redemption cards was set to Fye's personal home address rather than the shop address in Colleyville, Texas. *Id.* Wallace testified that Fye has not changed the address to have the cards shipped directly to Limelight. *Id.* Fye testified that he has no objection to returning the redemption cards, the Limelight Trading Cards (formerly Fye Sports Cards) Facebook Page,[4] or the WhatNot account to Limelight. ECF No. 139.

Wallace testified that Limelight experienced a significant decrease in sales following Limelight's ouster from the BLB Group.

---

[3] The court notes that Fye immediately corrected the member's confusion, stating "hey buddy, I'm no longer w/Limelight, this is completely separate so I wouldn't be able to use the consignment balance you have available with them. If you'd still like the spots, send me message w/your phone number & address!!"

[4] The court refers to this Facebook page as the Fye Sports Cards Facebook page.

ECF No. 26 at 94. Wallace explained that Limelight suffered a 60% decrease or more in sales and that Limelight is losing $50,000 per week. *Id*. Wallace also explained that customers are refusing to do business with Limelight because of the way that Fye departed. *Id*. at 108. Wallace explained that Limelight was also experiencing long term effects including having its reputation tarnished and experiencing a significant decrease in foot traffic at its retail store in Colleyville, Texas. *Id*.

### E. The Present Suit

On April 4, 2025, Limelight sued Fye, Black Label Breaks LLC (Fye's new business), and Logan Cox. ECF No. 1. Limelight makes several claims against the Defendants, including for trademark infringement, false designation of origin and unfair competition, violation of the Bankruptcy Court's Confirmation Order, breach of fiduciary duty, tortious interference with existing and prospective relations, and theft. *Id*. Limelight requested a temporary restraining order which the court denied. ECF No. 4. Limelight now seeks a preliminary injunction to require Defendants to transfer the WhatNot account, the redemption cards, and the BLB Group to Limelight. ECF No. 1. On April 30, 2025, the undersigned conducted a preliminary injunction hearing.

## 2. Preliminary Injunction Standard

"A preliminary injunction's purpose is to preserve the status quo, prevent irreparable injury to the parties, and 'preserve the court's ability to render a meaningful decision' after a trial on the merits." *Hardy Way, LLC v. TM Perfumes Wholesale, Inc.*, No. CV H-10-2735, 2010 WL 11579798, *2 (S.D. Tex. Aug. 31, 2010) (quoting *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975)). A request for preliminary relief that "goes well beyond simply maintaining the status quo . . . is particularly disfavored, and should not be issued unless the facts and law clearly favor the

moving party." *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

To secure a preliminary injunction, a plaintiff must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Janyey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (quoting *Byrum v. Landreth*, 556 F.3d 442, 445 (5th Cir. 2009)). "The failure to meet even one of the four elements requires the Court to deny the requested injunctive relief." *Williams v. Catoe*, No. 6:17-CV-627, 2020 WL 6948996, at *1 (E.D. Tex. Sept. 29, 2020) (citing *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)), adopted by No. 6:17-CV-627-JDK-KNM, 2020 WL 6940925 (E.D. Tex. Nov. 24, 2020).

### 3. *Preliminary Injunction Analysis—BLB Group and BLB Name*

#### A. Substantial Likelihood of Success on the Merits

While a preliminary injunction does not require a plaintiff "to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits[,]'" *Byrum*, 566 F.3d at 446 (quoting *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596 n.34 (5th Cir. 2003)), he must "identify an enforceable right that a preliminary injunction might safeguard." *Humana Ins. Co. v. Tenet Health Sys.*, No. 3:16-CV-2919-B, 2016 WL 6893629, at *13 (N.D. Tex. Nov. 21, 2016) (citing *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013)). To determine the likelihood of success on the merits, a court must look to the standards provided by the substantive law at issue. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

At the center of this dispute is the Black Label Breaks Facebook Group and the names "Black Label Breaks" and "BLB" (both of which are referred to as BLB). Limelight's theory is that Fye Sports Cards, LLC owned the BLB Group and the BLB name, which Limelight purchased pursuant to the Asset Purchase Agreement. Defendants' position is that the BLB Group and name were not Fye Sports Cards, LLC's assets, that they belonged to Fye personally, and that they did not transfer to Limelight under the Asset Purchase Agreement.

The court offered the parties an opportunity to conduct discovery before the hearing. ECF No. 12 at 41. Both parties chose not to conduct discovery. *Id.* As such, the court has none of Fye Sports Cards, LLC's books or records. Other than the statements and filings made in the Bankruptcy Court, which do not name BLB or Black Label Breaks, the court has no records showing Fye Sports Cards, LLC's assets, liabilities, or income sources. There are no records of how or by whom the BLB Group was formed. Accordingly, there is no documentary evidence that Fye Sports Cards, LLC owned the BLB Group.

On the other hand, the evidence presented at the hearing suggests that Fye Sports Cards, LLC did not own the BLB Group or name. The BLB Group was not mentioned in the Confirmation Order or the Asset Purchase Agreement. ECF No. 24-1. There is no evidence that the phrases "BLB" or "Black Label Breaks" were mentioned in any document filed in the Bankruptcy Court. It also appears that the BLB Group's monetary value was not accounted for in the Confirmation Order. Wallace testified at the hearing that he estimated the value of the BLB Group to be $2.5 million, ECF No. 26 at 116, but the Confirmation Order valued Fye Sports Cards' assets at $56,669.08. ECF No. 24-1 at 8.

Not only were the BLB Group and name excluded from any mention in the Bankruptcy Court, but they were also largely

excluded from the negotiations leading to the Asset Purchase Agreement. Wallace could not recall with any specificity discussing Limelight's purchase of the BLB Group or name pursuant to the Asset Purchase Agreement. ECF No. 26 at 38. Wallace agreed, in response to the undersigned's question, that the BLB Group was not a "highlight" of discussion between himself and Fye when Limelight was purchasing Fye Sports Cards, LLC's assets. *Id*. Yet, according to Wallace, the BLB Group is many orders of magnitude more valuable than all of Fye Sports Cards, LLC's other assets combined.

The court also notes that Fye's conduct after the Asset Purchase Agreement was executed is consistent with his current position that the BLB Group and name were not transferred under the Asset Purchase Agreement. As mentioned above in connection with Ill Fusion's efforts to market Limelight's products, Fye resisted changing any characteristic of the BLB Group to avoid confusing customers. *Id*. at 58. Fye testified that he specifically informed Wallace that Limelight had not purchased the BLB Group. *Id*. at 145.

Absent credible evidence to the contrary, on the current record before the court, the court concludes that the BLB Group and name were not Fye Sports Cards, LLC's assets. Because only Fye Sports Cards, LLC's assets were transferred to Limelight pursuant to the Asset Purchase Agreement, neither the BLB Group nor the BLB name were transferred to Limelight. To the extent that Limelight has no rights to either the BLB Group or the BLB name, Limelight cannot satisfy its burden on any of the causes of action it brings.[5] For the sake of completeness, however, the court will address each of Limelight's causes of action.

---

[5] Of course, this could change after discovery is conducted. The court's ruling at this early stage, at the insistence of both parties, could very well change once documents and other discovery are exchanged and the court has a more fulsome record to evaluate.

### i. False Designation of Origin and Unfair Competition (Fye and Black Label Breaks LLC)

Limelight asserts a claim for false designation of origin and unfair competition under Section 43(a) of the Lanham Act. ECF No. 1 at 9. That provision creates a cause of action against a person who, in connection with goods or services,

> uses in commerce any word, term, name, symbol, or device, or any combination thereof or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

*Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527 (5th Cir. 2015) (citing 15 U.S.C. § 1125(a)(1)(A)). Limelight asserts that it owns a common law trademark in the name "Black Label Breaks" because it purchased all of Fye Sports Cards, LLC's assets, which it argues included the BLB Group. ECF No. 1 at 10. Limelight argues that Fye's and Black Label Breaks' (Fye's new company) use of the BLB Group—which Limelight maintains it now owns—has caused confusion in the marketplace as evidenced by customers mistakenly paying Limelight for purchases made from Fye and Black Label Breaks.

As discussed above in Part 3, the evidence does not support Limelight's theory. Limelight has not shown that it owns either the BLB Group or name. Thus, Limelight has not shown that Fye's use of the BLB Group and name are in violation of the statute. Limelight has failed to demonstrate that it has a substantial likelihood of success on this claim.

### ii. Trade Secret Misappropriation—Defend Trade Secrets Act and Texas Uniform Trade Secrets Act (Fye and Black Label Breaks LLC)

Limelight argues that, to the extent that the BLB Group constitutes a trade secret, Fye and Black Label Breaks, LLC, misappropriated it by using the BLB Group to make sales. ECF No. 1 at 11–12. Limelight has presented no evidence concerning whether the BLB Group constitutes a trade secret. The court does not understand how a Facebook group, whose members are known to one another, could qualify as a trade secret. More importantly, however, Limelight has failed to prove that it owns the BLB Group and thus any corresponding trade secrets. Limelight has failed to show it has a substantial likelihood of success on this claim.

### iii. Violation of the Confirmation Order (All Defendants)

Limelight argues that the Defendants violated the Bankruptcy Court's Confirmation Order, ECF No. 24-1, by failing to transfer the BLB Group as part of Limelight's acquisition of Fye Sports Cards' assets. ECF No. 1 at 12. For Limelight to establish a violation of the Confirmation Order, it must show by clear and convincing evidence that a court order was in effect, that the order required certain conduct by the respondent, and that the respondent failed to comply with the court's order. *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000).

The Bankruptcy Court entered its "Order Confirming Debtor's Amended Plan of Reorganization" on September 27, 2024. ECF No. 24-1 at 2. The order required Fye Sports Cards to "take any action necessary or appropriate to implement, effectuate, and consummate the Plan and any transactions contemplated thereby or by this Order, including . . . the Asset Purchase Agreement[.]" *Id.* at 3. According to the Asset Purchase Agreement, Fye Sports Cards was required to "sell, transfer, assign, convey, and deliver,

13

or cause to be delivered, to the Buyer . . . the Assets." *Id.* at 40. Fye Sports Cards' "assets" included all tangible and intangible assets and property . . . including but not limited to intellectual property, whether or not specifically scheduled." *Id.*

Again, Fye asserts that the BLB Group was not an "asset" of Fye Sports Cards, LLC as it belonged to him personally. ECF No. 26 at 144. Wallace, on the other hand, asserts that he understood "assets" to include all assets in their "entirety," including all assets that were necessary to market and sell cards. *Id.* at 35. He stated that this included "customer lists," which included the members of the BLB Group. *Id.* at 31. Again, the evidence at this stage of the case does not support Limelight's contention. Because Limelight has failed to prove that the BLB Group was a Fye Sports Cards, LLC asset, it has failed to prove that control over the group had to be transferred under the Confirmation Order. Also, because the evidence does not establish that Fye Sports Cards, LLC violated the Confirmation Order, it follows that the evidence does not establish that Defendants Cox and Black Label Breaks, LLC aided Fye Sports Cards in violating the Confirmation Order. Limelight has failed to prove it has a substantial likelihood of success on this claim.

### iv. *Common Law Misappropriation and Unfair Competition (Fye and Black Label Breaks LLC)*

Limelight brings a claim of "common law misappropriation" against Fye and Black Label Breaks, LLC. ECF No. 1 at 12. To prevail on a claim for common law misappropriation, the plaintiff must show "(1) the creation of [plaintiff's] product through extensive time, labor, skill, and money; (2) defendants' use of that product in competition with [plaintiff], thereby gaining a special advantage in that competition because defendants were burdened with little or none of the expense incurred by [plaintiff]; and (3)

commercial damage to [plaintiff]." *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 839 (5th Cir. 2004).

Limelight asserts that "Fye misappropriated the BLB Group from Limelight, after Limelight had lawfully purchased it from Fye Sports Cards." ECF No. 1 at 13. For the reasons described above, the evidence does not show that Limelight purchased the BLB Group from Fye Sports Cards, LLC. This claim fails at this point.

### v. Breach of Fiduciary Duty (Fye)

Limelight argues that Fye breached his fiduciary duty to Limelight. ECF No. 1 at 13. To prove breach of fiduciary duty, a movant must show that a fiduciary relationship existed between the plaintiff and defendant; that the defendant breached his duty to the plaintiff; and that the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Pfeiffer v. Ajamie PLLC*, 469 F. Supp. 3d 752, 761 (S.D. Tex. 2019).

Limelight asserts that Fye was its employee and argues that Fye breached his fiduciary duty to Limelight by using the BLB Group, which allegedly belonged to Limelight, for his own financial purposes. *See* ECF No. 1 at 13 (citing Texas cases establishing that former employees are precluded from using material, confidential information, or trade secrets imparted to them by the former employer or developed on behalf of that employer). Again, for the reasons described above, the evidence does not support Limelight's position. The evidence shows that Fye had and continues to have the right to operate the BLB Group. Limelight does not have a substantial likelihood of success on the merits of this claim at this stage of the case.

### vi. Tortious Interference with Existing and Prospective Relations (All Defendants)

Limelight accuses the Defendants of tortiously interfering with their existing and prospective relations. ECF No. 1 at 14. Texas law recognizes two types of tortious-interference claims: one based on an existing contract and one based on interference with a prospective business relationship. *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421 (Tex. 2017). For both claims, a plaintiff must prove (1) a willful and intentional act of interference with the contract or prospective business relationship; (2) that proximately caused the plaintiff's injury; and (3) caused actual damages or loss. *See Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (interference with existing contract); *see also WickFire, LLC v. Woodruff*, 989 F.3d 343, 356 (5th Cir. 2021) (interference with prospective business relationship).

Limelight accuses the Defendants of interfering with its existing and prospective relationships by disparaging Limelight, excluding Limelight from access to the BLB Group, and using Limelight's intellectual property to compete with Limelight. ECF No. 1 at 14. Again, the evidence does not support Limelight's claims. If the BLB Group belonged to Fye exclusively, Fye, as the owner and administrator of the BLB Group, had the right to remove anyone from the group at will. Similarly, because Fye has rights to the BLB name, he cannot have committed a tort by using the BLB name. Moreover, in its motion, Limelight seeks only transfer of control of the BLB Group. To the extent that the instant claim is based on disparagement, it is not clear how the requested relief would provide Limelight with a remedy. On the record before the court, Limelight is not entitled to transfer of the BLB Group, and Limelight has not requested any relief specific to its claims of

disparagement. Limelight has failed to show a substantial likelihood of success on this claim.

### vii. Texas Theft Liability Act (Fye)

Limelight accuses Fye of theft under the Texas Theft Liability Act ("TTLA"). Under the TTLA, a "person who commits theft is liable for the damages resulting from the theft." Tex. Civ. Prac. & Rem. Code § 134.002(2), 134.003(a). Section 31.03(a) of the Penal Code defines theft as "unlawfully appropriate[ing] property with intent to deprive the owner of property." Tex. Penal Code § 31.03(a).

Limelight accuses Fye of unlawfully appropriating Limelight's property, including the BLB Group and the WhatNot Account. Fye has already agreed to grant Limelight access to the WhatNot account. ECF No. 26 at 139. Regarding the BLB Group, however, the evidence adduced to date does not support a theft claim. It appears that Fye may still own the BLB Group. He cannot be liable for theft on the current record before the court. The undersigned cannot say that Limelight has a substantial likelihood of success on this claim.

### B. The Remaining Factors

In addition to likelihood of success on the merits, in evaluating whether to issue a preliminary injunction, courts generally also consider whether a substantial threat of irreparable injury if the injunction is not issued, whether the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and whether the grant of an injunction will not disserve the public interest. *See* Part 2, *supra*. However, "failure to meet even one of the four elements requires the Court to deny the requested injunctive relief." *Williams*, 2020 WL 6948996, at *1. Because Plaintiff cannot establish a likelihood of success on the merits, the court need not address the remaining factors.

### 4. The Fye Sports Cards' WhatNot Account, Facebook Page, and Redemption Cards

The evidence and testimony presented at the hearing shows that: Fye Sports Cards possessed a Whatnot account prior to Limelight's acquisition of Fye Sports Cards' assets, ECF No. 26 at 75; that Fye changed the name of the Whatnot account to reflect Limelight's ownership after the Asset Purchase Agreement, ECF No. 26 at 36; that Fye agreed that the Fye Sports Cards Facebook Page and Whatnot account were transferred to Limelight pursuant to the Asset Purchase Agreement, ECF No. 26 at 150; and that Fye does not object to transferring to Limelight control over the Facebook Page, the Whatnot account, and the redemption cards, ECF No. 26 at 109, 139. Accordingly, there is no dispute for the court to resolve. All of the preliminary injunction factors weigh in favor of granting a preliminary injunction. Therefore, the court recommends that Fye be ordered to transfer to Limelight all control over the Fye Sports Cards' Facebook page and Whatnot account and that Fye take all steps to transfer to Limelight all of the redemption cards Fye Sports Cards, LLC acquired during its existence.

### 5. Conclusion

At this preliminary stage and on this record, the court recommends that Limelight's motion for preliminary injunction be **GRANTED** in part as to the Fye Sports Cards Facebook Page, the Whatnot account, and the redemption cards, and **DENIED** in part as to the BLB Group.

The parties have fourteen days from service of this Memorandum and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas on May 28, 2025.

Peter Bray
United States Magistrate Judge